ESTATE OF ANDREW JOHNSON, DECEASED.

[No. 10,740; decided October 9, 1894.]

Identity of Deceased—Expert Evidence.—The testimony of experts in handwriting as to the identity of a deceased person, depending on the apparent similarity or dissimilarity of signatures, is of little weight.

Identity of Deceased—When Established.—The evidence introduced in this case removed all reasonable doubt of the identity of the petitioner's brother, Anders Theodor Jonsson, with the deceased, Andrew Johnson, notwithstanding the testimony of an expert on handwriting to the contrary, and the failure of two witnesses who had personally known the deceased to recognize a tintype as his likeness.

The petitioner, in support of her application for distribution, introduced in evidence (1) the oral testimony of a witness who swore that he had known the deceased, Andrew Johnson, for about twenty-three years, and in particular, that he had worked with him in the mines at Knoxville, California, in 1866 or 1867; that as far as witness knew, there was at that time no other person named Andrew Johnson working or living at Knoxville; that the deceased had informed witness, among other things relating to his family, that he was born at Stockholm, Sweden, and that he had a married sister living in South Africa; and that the deceased at the time of his death in 1888, was about fifty years old; (2) duly authenticated abstracts (copies) from the records of Catharina, parish of Stockholm, proving, among other things, that claimant's parents were dead, that claimant was born at Stockholm, that her maiden name was Catharina Wilhelmina Jonsson and that she had one brother of the full blood, named Anders Theodor, born at Stockholm in 1838, and no other brother or sister; (3) the deposition of claimant, to which a number of letters were attached, which the claimant swore she had received from her mother, the letters containing frequent references to Anders, the son of the writer, and one in particular, of June 24, 1868, mentioning a letter sent by the same writer, on July 26, 1867, to her son Anders at "Knoxville, Lake county, California"; while another of those letters, of June 10, 1879, referred to the writer as "a cow with two calves";

(4) evidence showing the efforts made to find the heir or heirs of the deceased, the publicity given to the matter in Sweden and South Africa and the fact that no other person answering the name, age or description of the deceased was born at Stockholm; (5) a tintype attached to the deposition of claimant and by her stated to be a photograph of her deceased brother taken about 1870; (6) a letter attached to claimant's deposition and by her stated to have been received from her brother.

On the hearing two witnesses were examined who had known the deceased. Both of them swore that they did not recognize his features in the tintype. The signature of the letter, exhibit "B" was compared with signatures of the deceased contained in bank-books; and of two witnesses requested to give their opinions as to the identity of the writer, one swore positively that, in his opinion, the writer of the letter was the person who had signed his name in the bank-books, and the other swore as positively that he was not.

Gustav Gutsch, and Loewy & Gutsch, for the applicant, Catharina Wilhelmina von Stankewitz, nee Johnson.

Charles A. Sumner and Sumner & Moses, opposed.

Lucius L. Solomons, for the administrator, Thomas R. Hobson.

COFFEY, J. The petition of Catharina Wilhelmina von Stankewitz, nee Johnson, shows that on the thirty-first day of March, 1891, Thomas R. Hobson was appointed by this court the administrator of the estate of Andrew Johnson, deceased; that the said Thomas R. Hobson, on the seventeenth day of April, 1891, duly qualified as such administrator and thereupon entered upon the administration of such estate and has ever since continued to administer the same; that on the twentieth day of August, 1891, said administrator duly made and returned to this court a true inventory of all the estate of said deceased which had come to his possession or knowledge, all of which consisted of money; that on the twenty-second day of April, 1891, said administrator published notice to creditors to present their claims against the

said deceased, in the manner and for the period prescribed by law and by the order of said court; that more than one year has elapsed since the appointment of said administrator as such and more than ten months have expired since the first publication of said notice to creditors; that on the eleventh day of September, 1891, said administrator filed herein the first and final account of his administration of said estate, which account, after due hearing and examination, was finally settled; that all the debts of said deceased and of said estate, and all the expenses of the administration thereof thus far incurred, and all taxes that have attached to or accrued against said estate, have been paid and discharged, and that said estate is now in a condition to be closed; that the residue of said estate, now remaining under administration, as shown by the first and final account, consists of money, to wit, of the sum of eight thousand four hundred and eighteen 98/100 ($8,418.98) dollars, deposited in the Hibernia Savings and Loan Society, a corporation existing and doing business in said city and county, with the interest thereon accrued to date; that the said Andrew Johnson died intestate in the city and county of San Francisco, state of California, on or about the twenty-fifth day of December, 1888, leaving him surviving neither descendants nor father nor mother nor brother nor the child or children of any deceased brother or sister; that the petitioner, Catharina Wilhelmina von Stankewitz, nee Johnson, is now, and at the time of the death of said Andrew Johnson was, his only surviving sister and next of kin, and that she is therefore the only heir at law of said deceased and entitled to the whole residue of said estate.

After due notice, this application came on regularly for hearing and testimony having been taken and arguments made by the counsel respectively for and against the application, the court came to a conclusion, of which the subjoined is a summary, with the reasons therefor, based upon an examination of the evidence adduced in support of and in opposition to the claim.

### THE HANDWRITING.

There was a conflict of opinions in the testimony upon this point. The court took occasion to remark, in substance, that

it attached as much or as little importance to the testimony of experts on handwriting as to the opinion of a layman upon the same subject. Both experts and laymen may be mistaken in their opinions. Evidence of identity or nonidentity of person, depending on the apparent similarity or dissimilarity of signatures, is, to say the least, unreliable. To permit an impression or individual *opinion* of this kind to prevail against other evidence, consisting of a series of independent and uncontradicted *facts*, and a chain of circumstances excluding all reasonable doubt, would be tantamount to a declaration of the infallibility of that opinion.

As illustrations of the value of expert testimony in general, and of the errors of experts on handwriting in particular, the following excerpts from the journals of the day may be read with interest:

### "THE WOOTTON FORGERY.

Professor Sanders' Attorney Springs a Surprise on an Expert Chirographist.

"FRESNO, July 7.—Attorney Short sprung a surprise on the jury to-day in the Sanders forgery case. Yesterday he gave Cashier Reichman a long list of signatures to letters signed by Wootton. They were at the bottom of letters which had been put together so that only the signatures were exposed. There were seven of these letters. The witness stated *that all of them were forgeries.*

"This morning five of the letters were handed to him one at a time. He examined them carefully, and then stated that he did not know that the signatures were the same he had pronounced spurious yesterday. He stated *that three of them were genuine* to-day. He said that two of them were false, and the witness did not know whether he had ever seen them before or not."—"Examiner," July 8, 1894.

"Judge Joel M. Longenecker, ex-state's attorney at Chicago, who distinguished himself by the prosecution of the Cronin conspirators, recently delivered himself of the following opinions on the subject of expert evidence in criminal trials:

"It would be impossible for courts or litigants to dispense justice or obtain correct judgments without expert testimony.

There are experts on bookkeeping, experts on mechanism, *experts on handwriting,* microscope experts—in fact, there is not a business of any kind carried on but what at some time or place expert testimony is necessary. There is a growing tendency in this city and elsewhere, to call professional expert witnesses. Especially is it so in murder cases and condemnation suits and in special assessment cases or where benefits are asked in condemnation suits. While I appreciate expert testimony and know of its necessity, yet I cannot in too strong terms condemn the practice of hiring expert testimony. It is so often the case that an expert witness is biased and feels himself compelled to testify in favor of the party employing him as such witness.

"I mean by professional experts such men as hold themselves out as experts, who make a business of testifying, who stand ready to be employed as expert witnesses by either side. In condemnation cases here in this city, where a railroad desires condemnation of property, how often you see witnesses on one side swearing to the great value of the property and on the other swearing to its being of small value. It comes from one side employing experts who understand that their testimony shall be in favor of their employers. Such a witness knows that he cannot be impeached; that he cannot be prosecuted for perjury; that he is simply giving his opinion under oath.

"*It is true that often expert witnesses give their honest opinions, yet are mistaken.* Physicians cannot always tell the disease of man. They cannot always tell whether a man is of unsound mind or not, and they are oftentimes mistaken. Take the case of the man who, not being a lawyer, but feeling that he was qualified to fill the position of corporation counsel in a certain city, his object in insisting on being appointed to the high and honorable position being for the purpose of elevating tracks. His going to the incumbent of that office and informing him that he was to be appointed to the position and the incumbent introducing him to his assistants as the corporation counsel and the letters he wrote in relation thereto are of more value as showing his insanity than all the expert witnesses called.

"Take the act of that man purchasing a revolver going to the home of the mayor of that great city, who, while in the peace and quiet of his family, admitted him into his house, and then, without a word of warning, shooting the life out of this peaceable citizen. and public officer and then running from the house and going to the police and giving himself up, surrendering either from fear or because of his knowing he had murdered. That is more evidence of his sanity than the testimony of all the expert witnesses called to establish it. It is of greater weight in showing that he knew the difference between right and wrong than all the expert testimony."— "S. F. Law Journal," May 2, 1894.

If there are differences in the handwritings the distance of time and the change in the occupation of the deceased will go far toward explaining them, apart from the fact that the handwriting of a man who seldom writes cannot show such settled and characteristic lines as that of a man engaged in daily practice. When the letter, exhibit "B," was written, between 1854 and 1857, Andrew Johnson was a sailor. He had frequented a school of navigation in Sweden. In America he became a workingman in the mines. After he had been engaged in that calling long enough to save considerable money, in 1866, from nine to twelve years after the letter had been written, he deposited his savings in the Hibernia Bank and placed his signature in its book. His handwriting in the book of the Savings and Loan Society is dated in 1888, more than thirty years after the time the letter was written. The latter handwriting, compared with that of the letter, bears some characteristic signs of the changes which advancement in age will naturally produce in the handwriting of the same individual. However, this may be, taking the view most adverse to the petitioner, no more can be deduced from the comparison of these handwritings than that, judging by the comparison alone, it is doubtful whether the writer of the letter was Andrew Johnson, deceased, or not. The utter un-reliability of opinions on handwriting is most convincingly exposed in the very elaborate and highly interesting article entitled "The Howland Will Case," in volume 4, American Law Review, pages 625-663, and particularly pages 642, 643

and 644 referred to at length in the Dama Will Contest No. 6972, tried in this court. (See printed opinion in that case.)

## THE PHOTOGRAPH.

When the claimant received the tintype in 1880, twenty-four years had passed since she had last seen her brother. Her mother, in sending it to her, wrote (on June 25, 1880, letter exhibit ''E'' attached to claimant's deposition) that she, the mother, had had it for ten years. It was therefore taken about the year 1870. Mr. Hobson according to his own testimony, first met Mr. Johnson in 1883, thirteen years later. Johnson died in 1888. How could Hobson, in 1894, first, remember the exact features of a man with whom he had never been on terms of intimate acquaintance, and, secondly, trace them in a photograph of rather poor - workmanship, taken twenty-four years ago? We often fail to recognize a likeness of intimate acquaintances in tintypes made at the present time. Is it not our experience that the growth of or a change in the beard or the removal of it alters the appearance of a person so that he is not recognized by his friends or even his relatives? Is it strange that Erickson did not positively recognize Johnson on the photograph, if he, after a separation of five or six years, did not recognize the living man whose closest acquaintance he had been for a long time? Quoting from Erickson's deposition (which is part of the record), pages 8, 9, and 13:

''Q. Before you met him here at the Coso House, you did not see him for how many years? A. Five or six years.

''Q. Did you recognize him then? A. I recognized him, not at first. I got up one morning and he was sitting in the barroom and I didn't know him, and I was standing at the stove warming—it was cold that morning—and he nodded his head to me; I didn't know him and he nodded his head again. Then I went up to him and shook hands with him and asked him where he come from, and he said he had just come down from Knoxville.

''Q. What was the reason you did not recognize him at once? A. Well, I couldn't see him good, and he looked kind of shabby and rough—I looked pretty shabby myself—

and I didn't know who it was. I thought at first he was an Irishman and I didn't pay no attention to him; it was some five or six years that I didn't see him and I didn't recognize him.

"Q. What kind of clothes did he wear when you met him at Knoxville? A. Overalls and a jumper, same as any workingman wears.

"Q. Did you ever see him in any other kind of clothes? A. Well, I never seen him in any but working clothes except once in San Francisco, after he came back from Knoxville he bought a suit. I says, 'Andrew, you're dressing up; I wouldn't know you.' He said he paid $30 for it. I hardly knew him.

"Q. What kind of clothes were they? A. Kind of dark woolen clothes.

"Q. And you hardly recognized him? A. I hardly recognized him next morning; when he passed I looked at him and hardly knew him. I said something about his being dressed up, and then we had a drink of beer.

"Q. Did Mr. Johnson used to shave himself? A. Well, sometimes; I think he did; most of the time he used to trim his whiskers with a scissors; I don't remember ever seeing him shave or not. I know one time he had a lot of long whiskers, and cut it—he trimmed them and I hardly knew him. I says, 'Andrew, you're looking fine, who cut your whiskers?' And he said, 'I trimmed them myself.' I said, 'Why don't you go to a barber?' 'Oh!' he said, he would cut them himself and he had saved ten cents.'"

In these circumstances no weight can be attached to Hobson's failure to recognize the deceased in the tintype.

### ERICKSON'S TESTIMONY.

If this petitioner is not the right heir, then the testimony of Lerus Erickson is perjury from beginning to end; and other important parts of the evidence must be likewise spurious.

A witness is presumed to speak the truth; and there being absolutely nothing in the record to rebut the presumption, and Erickson's manner greatly strengthening it, his statements should be considered as true.

The court, at the conclusion of the hearing, remarked that Erickson's testimony was unimpeached and that it believed him to have spoken the truth.

Erickson swore that about the year 1866 he first met the deceased, Andrew Johnson, in the Knoxville quicksilver mines; that at that time the deceased was "working in the mines, and as a laborer outside, packing tools and one thing and another to the stone mason—mortar and things like that, same as a hod carrier"; that the witness and the deceased worked at Knoxville together for about a year; that at the end of that time, witness left Knoxville, and Andrew Johnson remained there; that the latter was then about thirty years old, that witness subsequently, in 1873, met the deceased again at Knoxville, who in all worked there during ten years.

Erickson further testified that ordinarily the deceased was reticent about his relatives, but that at one time, on Portsmouth Square, San Francisco, witness asked him if he had a sister or brother, and the deceased said that he had. Witness could not state positively whether Andrew Johnson mentioned a brother or not; but he remembered distinctly what was said in regard to a sister. The uncertainty of witness as to the brother was most probably caused by the very form of his question; for when he asked whether the deceased had a brother or sister, and the deceased answered "Yes," it was not clear whether he meant that he had a brother, or a sister, or both. And to this source the rumor that Andrew Johnson, deceased, had a brother, upon which, for years, opposing counsel has harped, may be traced. All there appeared of it in evidence was that Hobson thought that at one time Erickson told him that Andrew Johnson had told Erickson that he, Andrew Johnson, had a brother; and Erickson, though he did not remember having so informed Mr. Hobson, could not state with certainty that he had not. What if he had? What if he, not foreseeing the importance which might be attached to his words in the future, carelessly repeated the substance of his conversation with the deceased and incorrectly gave to the word "brother," contained in his question, a place in the answer? What if Hobson, not a very thorough scholar himself, happened to misunderstand the meaning and purport

of his words? It is a matter of common experience that statements, after they have been reported by the mouths of two or three illiterate persons, seldom preserve their original form, and that, as changed, they sometimes constitute the exact opposite to what was said by the first speaker. Be this as it may, no trace of a brother of the deceased has ever been found; no witness has been produced who would swear upon knowledge that Andrew Johnson himself ever mentioned a brother of his; no record of Andrew Johnson's birth, no public or private document has been shown wherein the existence of a brother is mentioned; and the efforts of the attorney for absent heirs in endeavoring to find the supposed relative have been unavailing.

In regard to his sister, Johnson told Erickson that she was married and that she had moved to South Africa. The deceased also informed witness that he was born at Stockholm (which agrees with the statements contained in the bankbooks); that he "took navigation in Sweden" and went to sea as a sailor before he came to the mines; and that, in 1888, both his parents were dead.

On cross-examination, Erickson stated that while he was working at Knoxville, no person named Andrew Johnson resided there that he knew of, except the deceased.

### DEPOSITION OF CLAIMANT.

The petitioner, in her deposition, which is unimpeached, testifies that she was born May 27, 1837, at Stockholm; that she never had but one brother, and that his name was Anders Theodor; that he was born at Stockholm in 1838, after the death of his father; that when about sixteen years old, he commenced to serve a three years' apprenticeship as a sailor; that at the end of that time (that is, about 1857) he decided to settle in America; that he did so as a digger on the California gold-fields; that she saw him for the last time about 1856, at Stockholm, in the presence of her mother; that in 1863, she left for South Africa, where she arrived in 1864 and has since resided; that she obtained the first information of her brother's death through an advertisement published by the consul general of Sweden and Norway at Capetown,

in the "Transvaal Advertiser" of August 21, 1891, inquiring for information respecting Katarina Wilhelmina Johnson, "born in the parish of Cartarina, Stockholm, 1837, and who arrived in Cape Colony about twenty years ago, and subsequently left for Pretoria, where, it is believed, she married one Strankevitz."

The deponent produced a number of letters received from her mother in Stockholm. In each of them she lovingly speaks of her son "Anders," never mentioning or referring to any other child of hers except the one to whom the letters are addressed, the sister of "Anders." In one of the letters, that of June 10, 1879, exhibit "E," referring to her daughter's second marriage, she writes: "And you have married again and sold your liberty. Not would I belong to another man. Your father asked me once before he died, if I would remarry, but I replied, nobody will have *a cow with two calves;* that task every man will take upon himself, and besides, I do not want aný other." All of the letters are signed "Catharina Jonsson."

In the letter, exhibit "C-I," of December 10, 1867, the mother writes to her daughter: "I have received no letter from Anders this year. Christmas '66 I received the last. . . . . On the 26th of July, I wrote to Anders *under the old address.* Can you, Mina, give me any information where Anders is, how glad I would be in my solitude. As long as I live I have him and you in my thoughts, night and day. I care not for the whole world. I can see but poorly, and I cannot endure much."

On June 24, 1868, in the letter Exhibit "C-2," the mother writes: "On the 26th of July I sent a letter to Anders under the address of *Knoxville, Lake County, Calefornien.*" The letter here referred to is evidently the same as that which the mother mentioned in her previous letter as having been sent, on the 26th of July, to Anders "under the old address." The old lady, feeling lonely and having nothing else to think of, carefully noted or remembered the dates of her letters.

In the same letter, exhibit "C-2," of June 24, 1868, the mother writes to her daughter: "You were married on the

24th of July, and I was married on the 31st of the same month, year '36, and in the same month on the 11th your father died; he was 31 years, 3 months and 11 days old.''

Letter, exhibit ''C,'' of June 24, 1865: ''Anders has many times been thinking of coming home, but on account of the small wages they paid here in old Sweden, he has let that drop and is satisfied to stay where he is. Anders says it is a better country, and when a man has his health he can make a good deal more money than in old Sweden.''

Letter, exhibit ''D,'' of January 8, 1871: ''I am not sure whether or not Anders will come home, as I have had no letter from him since February. I am sending letters, but no reply.''

Letter, exhibit ''D-2,'' of June 28, 1872: ''I have heard nothing from Anders in a year and a half. He is alive, for August sent greetings from him last Christmas, when he was in good health.''

The letters are all very long, and, in addition to the passages quoted, contain a great deal of matter indifferent to this issue. Their genuineness is not denied, and their age is shown, not only by their dates, but also by the appearance of the paper and ink.

Exhibit ''A,'' attached to the deposition, is a certificate showing that on April 25, 1852, Catharina Wilhelmina Jonsson was confirmed at Stockholm; that she moved, November 16, 1854, from Catharina to Maria Parish; November 6, 1857, from Maria to Nicolai; December 9, 1858, from Nicolai to Jacob; December 5, 1859, from Jacob to Kungsholman, and on December 1, 1860, from Kungsholman to Jacob; that May 9, 1863, she partook of the holy communion and that thereafter (no date being given) she was moving (about to move) to South Africa.

This certificate confirms a statement made by the opponent of this claim, that ''a laboring man can hardly go from one parish to another in Sweden, for change of residence, without a certificate from his former parish which thoroughly identifies him, or sufficiently identifies him so as to make his entire parish record easy of ascertainment for whoever chooses to inquire.''

### THE PARISH RECORDS.

The parish records also are unimpeached; and, in view of the great care exercised by the Swedish authorities in recording the personal status of their citizens, no more reliable evidence of relationship than such records can be produced.

According to the same, Anders Jonsson, mason, born March 30, 1807, in 1829 moved from Lemnhult to Stockholm, being then single.

Catharina Hjertberg, born November 8, 1807, was married to the said mason, Anders Jonsson, at Katarina Parish, Stockholm, July 31, 1836. (Compare her letter, exhibit "C-2," of June 24, 1868, supra.)

Two children issued from this marriage, viz., Catharina Wilhelmina, born May 27, 1837, and Anders Theodor, born September 9, 1838.

The father died July 11, 1838, before the birth of his son.

The mother, "widow Jonsson, born Hjertberg," died at the Katarina Poorhouse, Stockholm, December 13, 1882.

Considering these facts together (and comparing them, moreover, with the letter, supra, in which the mother designates herself as *a cow with two calves*), it is evident that the claimant never had any brother or sister, except the one, Anders Theodor.

### OTHER EVIDENCE.

Halfdan Grotschier, secretary of the Swedish and Norwegian consulate at San Francisco, called on the stand as a witness, testified that the Swedish government, after a thorough investigation, concluded that Catharina Wilhelmina Jonsson, who had moved to South Africa and subsequently married one Strankevitz, was the sister and only heir of Andrew Johnson, deceased; and the notice in the "Transvaal Advertiser," published by the consul general of Sweden and Norway at Capetown, and attached to the deposition of claimant, agrees with that statement.

Mr. Sumner, counsel opposing this claimant, has shown himself to be well aware of the exceeding care, completeness and accuracy noticeable in Swedish personal records. The extracts from parish registers, moreover, produced in this case, are proof of the fact.

The inference is that the Andrew Johnson here in question, aged about fifty years at the time of his death, born at Stockholm, with a sister living in South Africa, was identical with Anders Theodor Jonsson, born at Stockholm September 9, 1838. Although the latter's name was Anders Theodor, his mother, in her letters, never called him but Anders; and this is in conformity to a well-known custom, more prevalent in Europe than in America, of dropping one's middle name and using only the name—in German termed "Rufname"—by which one is accustomed to be called at home.

It requires no comment that "Johnson," as used by Swedes in America, is the equivalent of Jonson or Jonsson in Swedish.

Importance is imputed to the fact that in the Hibernia bank-book of 1866, under the rubric of "maiden name of the depositor's mother" that of Andrew Johnson's mother is stated to be "Catharina Johnson" and not "Catharina Hjertberg." In the first place, this does not prove conclusively that the deceased himself declared "Catharina Johnson" to be his mother's maiden name. For the clerk who wrote the name was not called as a witness and did not testify that the decedent so stated, but assuming that the clerk would have testified to the circumstances of the entry under oath, he might have been asked whether the deceased, at that time, knew English well enough to understand the meaning of the words "maiden name"; whether he did not think, as people of his class frequently think, that by the "maiden" name of his mother her "Christian" name was intended; whether the question was clearly asked; and at all events, if it was not the *maiden* name, it was at least the right name of the mother.

Taking these and other possibilities into account, this entry, if it can be considered at all as a fact in evidence, is of no consequence.

CONCLUSION.

It thus appears, first, that there existed a certain Anders Theodor Jonsson, born at Stockholm in the year 1838. This Anders Theodor Jonsson had a sister, Catharina Wilhelmina Jonsson, born at Stockholm in 1837, who subsequently went to South Africa and married one Stankewitz. Her father died previously to the birth of her brother, and she never had

any other brother or sister. Her brother, at the age of sixteen, commenced to serve a three years' apprenticeship as a sailor. At the end of that time, he concluded to settle in America, and he went to work in the California mines. Thence he repeatedly wrote to his mother, and in 1866 informed her that his address was at "Knoxville, Lake County, Calefornien."

Second. It further appears that there worked in the mines at Knoxville, California, in the year 1866, and subsequently to that time, and altogether for about ten years, one Andrew Johnson, whose age, in 1866, 1867 or 1868, was about thirty years, who was born at Stockholm, who had gone through a course of training as a sailor before he became a laborer in the mines, and who had a married sister residing in the South of Africa, and, so far as has been ascertained by a careful search, no other relative living at the time of his death.

Each of these two series of facts, mentioned under "first" and "second" is established by independent evidence which, as a separate proof, is *nowhere impeached or contradicted by anything appearing upon this record.* The conclusion from these coincidences is that Andrew Johnson, the deceased, and Anders Theodor Jonsson, the brother of claimant, were one and the same person. As greatly strengthening the conclusion, and making it a matter almost of demonstration, the following facts may be noticed:

Third. The records of Stockholm, so far as they have been and must be presumed to have been investigated, show that no person answering the name, age, birthplace, relationship and occupation of Andrew Johnson, deceased, except the above-mentioned Anders (Theodor) Jonsson, was ever born there. As the nonexistence of another such person is a purely negative fact, the claimant, to establish her case, is not required to prove it.

The claimant has introduced evidence to the effect that every reasonable and even possible effort has been made by the government of Sweden and Norway to ascertain the true heir or heirs, and that the records of the realm, so carefully kept reveal no surviving relative of the deceased except this claimant.

Fourth. Mr. Sumner, the attorney for absent heirs, as he frequently stated in court, and as appears otherwise from the record, by letters and by advertisements in newspapers throughout Sweden and the Cape Colony, made Andrew Johnson's death extensively known and announced to the world that the decedent left a considerable estate, the heirs of which were notified to appear; and notwithstanding every inducement and encouragement thus offered to other claimants, and the time, five years and seven months, elapsed since the death of Andrew Johnson, no other alleged heir has ever put in an appearance.

Fifth. What evidence there is in the record upon the point is to the effect that no Andrew Johnson except the deceased ever lived at Knoxville between 1866 and 1876.

Combining the series of facts thus established, each for itself, by positive, uncontradicted and unexceptionable evidence, and supplementing them by the inferences necessarily arising from the facts just referred to under "Third," "Fourth" and "Fifth," a chain of evidence is formed from which there is no escape. The margin of possibility that, with these coincidences, which are not, and cannot be, denied, there was no identity of Andrew Johnson, deceased, and Anders Theodor Jonsson, the brother of claimant, is so small that the law will not consider it. The identity is shown, not by a preponderance of evidence, but by evidence *excluding all reasonable doubt.*

The prayer of the petitioner is granted.